UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

JOLENE WALDRON, as the Personal
Representative of the Estate of Anthony
R. Ybarra, Jr. a minor

    Plaintiff,

v.                                                    Case No: 5:16-cv-658-Oc-32PRL

GREGORY SPICHER and BILLY
WOODS

    Defendants.

## REPORT AND RECOMMENDATION[1]

Before the Court is Defendant Marion County Sheriff's Deputy Gregory Spicher, Jr.'s motion to dismiss. (Doc. 16). The Plaintiff, Jolene Waldron, complains that Deputy Spicher violated her son's substantive due process rights under the Fourteenth Amendment to the United States Constitution by causing his death; she also brings a wrongful death claim under state law.

Deputy Spicher seeks the dismissal of the counts against him and asserts that as a law enforcement officer he is entitled to qualified immunity under 42 U.S.C. § 1983 and statutory immunity under Florida Statute § 768.28. For the reasons discussed below, however, I submit that Deputy Spicher's motion should be denied in its entirety.

---

[1] Within 14 days after being served with a copy of the recommended disposition, a party may file written objections to the Report and Recommendation's factual findings and legal conclusions. *See* Fed. R. Civ. P. 72(b)(3); Fed. R. Crim. P. 59(b)(2); 28 U.S.C. § 636(b)(1)(B); Local Rule 6.02. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1.

# I. BACKGROUND[2]

Plaintiff alleges, on behalf of her fourteen-year-old son Anthony's estate, that his death resulted from the actions of Deputy Spicher. (Doc. 9). On November 14, 2014, Anthony attempted suicide. (Doc. 9 at ¶ 16). He made the attempt by hanging himself from a tree apparently next to Plaintiff's house. Anthony's attempt was discovered when his brother looked out a window of the house; the brother noted that Anthony "must have struggled or something after he did it or thought about it because he was moving a little bit, so he must have just did it." (Doc. 9 at ¶ 16). Plaintiff ran outside screaming for help. (Doc. 9 at ¶ 16).

Having heard her screams, Jay Timson, a neighbor and a former paramedic, appeared and lifted the child's body to increase air flow. (Doc. 9 at ¶¶ 17–19, 21). Around this time, Timson's wife called 911, alerting Marion County 911 Service that a suicide threat had occurred. (Doc. 9 at ¶ 18). Timson held Anthony up for two to three minutes until Plaintiff found a knife and cut Anthony from the tree. (Doc. 9 at ¶ 19). Timson observed that Anthony was not "as cold as he should have been" and began CPR (ten compressions and two breaths) for about five minutes.[3] (Doc. 9 at ¶ 19).

Then, Karen Vanes, an experienced licensed practical nurse (LPN) of thirty years (and perhaps another neighbor, the complaint doesn't say), arrived. Noticing that Anthony was "gasping for air," she began to assist Timson with CPR. (Doc. 9 at ¶ 20). The neighbors, with Timson administering breaths and Vanes giving compressions, then completed three rounds of thirty compressions and two breaths. (Doc. 9 at ¶ 20).

---

[2] The background "facts" are taken from Plaintiff's amended complaint (Doc. 9) (which is the operative pleading) and are taken as true for purposes of this motion to dismiss. *See, e.g.*, *Watts v. Florida Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007).

[3] The complaint never states whether Anthony was conscious during this incident.

Next, Deputy Spicher arrived on the scene about ten minutes after the 911 call was made. (Doc. 9 at ¶ 21). The Deputy was presumably responding to the 911 call. In any event, he walked seventy-five paces from a nearby street to where Anthony laid. The Deputy then instructed Timson and Vanes, who were still administering CPR, to stop. (Doc. 9 at ¶¶ 21–22). The neighbors apparently obeyed this instruction. It gets worse.

The complaint does not allege that Deputy Spicher even looked at Anthony or checked his vital signs before making this command. (Doc. 9 at ¶ 21). Nor does the complaint state that the Deputy asked Plaintiff (or the neighbors) what had happened or whether Anthony was still alive before instructing the neighbors to stop giving CPR. (*See* Doc. 9 at ¶ 21).

Rather, the complaint recites that "without checking on Anthony," and perhaps directly after instructing the neighbors to stop CPR, that Deputy Spicher radioed incoming assisting units that "there was no need to hurry" and that "there was 'no rush, it's a Code Seven'" (typically meaning deceased).[4] (Doc. 9 at ¶ 22). This call "slowed all units to cold." (Doc. 9 at ¶ 22).

Marion County Fire Rescue personnel arrived nearly one minute after Deputy Spicher. (Doc. 9 at ¶ 23). But Deputy Spicher stopped a trio of paramedics from reaching Anthony and—only "eventually"—allowed only one of the three, David Warren, to approach Anthony.[5] (Doc. 9 at ¶ 23). According to Plaintiff, due to the Deputy's actions, "Fire Rescue personnel were unable to assist Anthony in critical moments, which could have saved his life." (Doc. 9 at ¶ 23).

Then, Warren examined Anthony, noted that the boy was still warm and that he still had a pulse (a monitor "revealed Agonal pulse electrical activity rhythm at 24 BPM"). Warren screamed

---

[4] In her response to Deputy Spicher's motion to dismiss, Plaintiff asserts that Deputy Spicher made this radio call prior to his arrival at the scene of the incident. (Doc. 21 at 5). The complaint does not state the exact time that the Deputy made this call and to what extent this radio call delayed the other units.

[5] It is unclear from the complaint in what way the Deputy prevented the other two paramedics from treating Anthony and how long he delayed Warren.

out to the Deputy to call Warren's Lieutenant, but Deputy Spicher, who was on the phone, ignored his shouts. (Doc. 9 at ¶ 24). Warren screamed louder. The remaining paramedics, hearing these yells, decided to approach Anthony and then reinitiated CPR, "with life signs."[6] (Doc. 9 at ¶¶ 25–26). Anthony was then transported to a hospital but passed away about one week later. (Doc. 9 at ¶¶ 26–27).

Plaintiff asserts that, in sum, Deputy Spicher "eliminated the opportunity for Anthony to receive life-saving medical help." (Doc. 9 at ¶ 27). She alleges further that the Deputy "had been trained to administer CPR" and that "[h]is years of advanced medical training and experience should have been a benefit in this instance." (Doc. 9 at ¶ 28). She concludes that "[a]s a result of Deputy Spicher's harmful delay and lack of response to Anthony, he went without critical medical care" and that "[a]s a result of the denial of medical attention, Anthony died." (Doc. 9 at ¶¶ 26, 27).

Based on these allegations, Plaintiff filed suit against Deputy Spicher asserting two counts: one under § 1983 for medical indifference (Count I) and another under Florida Statute §§ 768.16–28 for wrongful death (Count III).[7]

Plaintiff, who is acting as the personal representative here, brings these claims on behalf of herself (she is Anthony's mother) and on behalf of Anthony's father, brother, sister, and estate. (Doc. 9 at ¶ 8). Deputy Spicher now moves to dismiss these counts on qualified immunity (Count I) and statutory immunity (Count III) grounds under Rule 12(b)(6).

---

[6] The complaint does not state how long Anthony laid without treatment; that is, the complaint does not detail the time between when the neighbors ceased CPR and when the paramedics reinitiated CPR.

[7] Plaintiff also asserts a single count against Marion County Sheriff Billy Woods, in his official capacity, but that claim is not at issue here.

4

## II. LEGAL STANDARD

The bare minimum a plaintiff must set forth in his or her complaint is found in Fed. R. Civ. P. 8. Under Rule 8, "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The United States Supreme Court has explained, in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), that while particularity is not required under Fed. R. Civ. P. 8, as it is under Fed. R. Civ. P. 9, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Instead, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570).

A claim is plausible on its face where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Plausibility means "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted). In short, to survive a motion to dismiss a plaintiff must allege something more "than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citing *Twombly*, 550 U.S. at 555).

The Eleventh Circuit utilizes a two-pronged approach in its application of the holdings in *Iqbal* and *Twombly*. First, the court will "eliminate any allegations in the complaint that are merely legal conclusions." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010). Then, "where there are well-pleaded factual allegations," the court will "'assume their veracity and then

determine whether they plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679).

In applying this two-step approach to determine the complaint's sufficiency under Rule 8 (and in turn the plausibility of the claims), the Eleventh Circuit limits its "consideration to the well-pleaded factual allegations, documents central to or referenced in the complaint, and matters judicially noticed." *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004). Further, the Court can infer "'obvious alternative explanations,' which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *Am. Dental Ass'n*, 605 F.3d at 1290 (quoting *Iqbal*, 556 U.S. at 682) (brackets omitted).

## III. DISCUSSION

Deputy Spicher seeks the dismissal of Plaintiff's § 1983 substantive due process medical indifference claim, her request for punitive damages (that are based on the medical indifference claim), and her state-law wrongful death claim. As developed below, Plaintiff's claims are plausible under the alleged facts and compel denial of Deputy Spicher's motion in its entirety.

### A. Substantive Due Process

Deputy Spicher asserts that he is entitled to qualified immunity, shielding him from Plaintiff's medical indifference claim. It is well established that government agents are "shielded from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

"The privilege is an immunity from suit rather than a mere defense to liability." *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (quotation and citation omitted). Qualified immunity protects government agents because individual capacity suits "can entail substantial social costs, including

the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). To minimize those social costs, qualified immunity should apply "at the earliest possible stage of litigation." *Saucier*, 533 U.S. at 201 (quotation and citation omitted). If a complaint fails to state a claim sufficient to overcome qualified immunity, then the court should dismiss the action under Rule 12(b)(6) at the outset, without allowing discovery. *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Gonzalez v. Reno*, 325 F.3d 1228, 1233 (11th Cir. 2003) (recognizing that it is appropriate for a district court to grant the defense of qualified immunity at the motion to dismiss stage if a plaintiff fails to allege a clearly established constitutional violation).

When considering a plaintiff's claims, "[t]he threshold inquiry a court must undertake in a qualified immunity analysis is whether plaintiff's allegations, if true, established a constitutional violation." *Hope*, 536 U.S. at 736. "[T]he next, sequential step is to ask whether the right was clearly established." *Saucier*, 533 U.S. at 201. "For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope*, 536 U.S. at 739.

The Supreme Court explained that the standard of liability is so high that it protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341; *see also Hope*, 536 U.S. at 741 (noting that the "salient question" that a court must answer when making this inquiry is whether the state of the law at the time of the incident gave the officer "fair warning" that his alleged treatment of the plaintiff was unconstitutional). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in light of the pre-existing law the

unlawfulness must be apparent." *Id.* at 739. Indeed, in the Eleventh Circuit the courts will generally accord "official conduct a presumption of legitimacy." *Gonzalez*, 325 F.3d at 1235 (quotation and citation omitted).

It is undisputed here that Deputy Spicher had discretionary authority at the time of his alleged actions; he acted while performing his official duties. (Doc. 9 at ¶¶ 13, 28, 33); s*ee Lenz v. Winburn*, 51 F.3d 1540, 1545 (11th Cir. 1995). Thus the burden shifts to Plaintiff to prove that qualified immunity should not apply.

1.  "In order to prevail on a civil rights action under § 1983, a plaintiff must show that he or she was deprived of a federal right by a person acting under color of state law." *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1303 (11th Cir. 2001). Plaintiff alleges that Deputy Spicher, "acting in the role of a law enforcement officer," is liable for Anthony's death, as he was medically indifferent to Anthony's "blatant, obvious, and profound medical needs while he lay on the ground, struggling to live," thereby violating his Fourteenth Amendment rights.[8] (Doc. 9 at ¶¶ 28, 29, 30).

The parties agree that substantive due process rights are at issue (Docs. 16 at 8–9; 21 at 3–4, 7–8). "The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity." *Albright v. Oliver*, 510 U.S. 266, 272 (1994).

Notably, the complaint never alleges that Anthony was in custody during the incident (and, in her response to the motion to dismiss, Plaintiff does not argue that he was).[9] (*See* Docs. 9; 16 at

---

[8] "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.

[9] This count includes by reference paragraph one of the complaint, which asserts that this action arises under both the Fourth and Fourteenth Amendments, though in this non-custodial case only the Fourteenth Amendment applies. *See Cty. of Sacramento v. Lewis*, 523 U.S. 833, 843–44 (1997).

10; 21). So, in a non-custodial setting, such as this one, "a substantive due process violation would, at the very least, require a showing of deliberate indifference to an extremely great risk of serious injury to someone in [the victim's] position." *Waddell v. Hendry Cty. Sheriff's Dep't*, 329 F.3d 1300, 1306 (11th Cir. 2003).

Although this claim arises under the Fourteenth Amendment, Eighth-Amendment-type-scrutiny applies to such deliberate indifference claims.[10] *See Melton v. Abston*, 841 F.3d 1207, 1220 (11th Cir. 2016) ("As a pretrial detainee . . . , [the plaintiff's] rights arose under the due process clause of the Fourteenth Amendment rather than the Eighth Amendment," but "[n]onetheless, [the] claims are 'subject to the same scrutiny as if they had been brought as deliberate indifference claims under the Eighth Amendment.'") (quoting *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306 (11th Cir. 2009)). "Deliberate indifference to a prisoner's serious medical needs violates the eighth amendment because denying or delaying medical treatment is tantamount to 'unnecessary and wanton infliction of pain.'" *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).

Generally speaking, an Eighth Amendment claim for deliberate indifference requires that the plaintiff allege the following elements: "'(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence.'" *Townsend v. Jefferson Cty.*, 601 F.3d 1152, 1158 (11th Cir. 2010) (quoting *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005)) (brackets omitted). And under the Eight Amendment, "conduct deliberately indifferent to serious medical needs has included: (1) grossly inadequate care; (2) a decision to take an easier but less efficacious course of treatment; and (3) medical care that is so cursory as to amount to no treatment at all." *Melton*, 841 F.3d at 1223. Further, a "defendant who unreasonably

---

[10] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

fails to respond or refuses to treat an inmate's need for medical care or one who delays necessary treatment without explanation or for non-medical reasons may also exhibit deliberate indifference." *Id.*

Further, and importantly, to support a due process claim under the Fourteenth Amendment in the non-custodial context Deputy Spicher's actions must have also shocked the conscience. Indeed, in this Circuit "state and local government officials violate the substantive due process rights of individuals not in custody only when those officials cause harm by engaging in conduct that is 'arbitrary, or conscience shocking, in a constitutional sense,' and that standard is to be narrowly interpreted and applied." *White v. Lemacks*, 183 F.3d 1253, 1259 (11th Cir. 1999) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 128 (1992)). Proving negligence, of course, is inadequate to establish conscience-shocking behavior. *See Lewis*, 523 U.S. at 849. "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action *most likely* to rise to the conscience-shocking level." *Id.* (emphasis added). The Court recognizes, of course, that "[d]eliberate indifference that shocks in one environment may not be so patently egregious in another, and [a court's] concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking." *Id.* at 850.

With all this in mind, the parties agree here that to survive dismissal Plaintiff must allege facts showing that Deputy Spicher was deliberately indifferent to Anthony's medical needs in a way that shocks the conscience. (Docs. 16 at 10–11; 21 at 4–8). I submit that Plaintiff has met this burden.

As stated in the complaint, Deputy Spicher arrived on the scene after a 911 call notifying authorities of a suicide threat. The facts support a reasonable inference that Deputy Spicher was

dispatched because of the 911 call and arrived with knowledge that he was responding to a suicide attempt. (*See* Doc. 9 at ¶¶18, 21). Upon his arrival, the Deputy was confronted with ongoing CPR treatment. But despite this, and apparently without examining Anthony, he ordered the boy's neighbors to cease CPR.

Indeed, there is no allegation that the Deputy ever examined Anthony (or even asked Plaintiff and the neighbors if Anthony was still alive or how the child attempted to commit suicide); the only allegation as to whether he evaluated Anthony is that the Deputy acted "without checking on Anthony." Further, despite having medical training as part of his profession (including CPR training), Deputy Spicher himself made no attempt to assist with life-saving treatment at any point while on site.

Also, in addition to stopping the CPR that was occurring, Plaintiff asserts that Deputy Spicher prevented, for some unknown amount of time, Fire Rescue personnel from attending to Anthony upon their arrival, *eventually* allowing only a single paramedic to treat Anthony. So, as plead, Anthony, after hanging himself, laid on the ground for some period of time alive, yet abandoned and unassisted due the Deputy's actions. I submit that these alleged acts shock the conscience.

Notably, as to the radio call the Deputy made to slow down the other emergency units "without checking on Anthony," the complaint does not clarify when this call was made. Plaintiff, in her response to the instant motion, asserts that Deputy Spicher made this call before ever arriving on the scene. (Doc. 21 at 5). While the complaint does not make clear when this radio call was made, viewing the facts in a light most favorable to Plaintiff and given all the other alleged acts at issue here, whether it was made before even arriving on the scene or after arriving, but without

11

confirming the condition of the boy, the facts make a plausible showing that it impeded care and was made without any legitimate reason: also conscience shocking.

The facts presented thus satisfy the three required elements of Plaintiff's claim. *See Townsend*, 601 F.3d at 1158 (noting that "[t]o prove [the plaintiff's] complaint of deliberate indifference . . . , [she] had to present evidence that she had a serious medical need, the deputies were deliberately indifferent to that need, and her injury was caused by the deputies' deliberate indifference"). Deputy Spicher apparently responded to an emergency call for a suicide threat and arrived to see neighbors giving CPR to Anthony, both of which (that is, the 911 call and CPR treatment) would have indicated that there was a great risk of serious harm to Anthony.[11] Despite knowing this, he disregarded the risk to Anthony's life and instructed the neighbors to cease their life-saving attempts, slowed down the Fire Rescue personnel, and even prevented all but one of those personnel from attending to Anthony upon their arrival at the scene—all acts that he allegedly performed without evaluating whether Anthony was still alive. Lastly, Plaintiff alleges that Deputy Spicher's actions deprived Anthony of medical care to such a degree as to cause the child's death.

Deputy Spicher, in his motion, analogizes this case to another case from this District: *Olson v. Barret*, No. 6:13–cv–1886–Orl–40KRS, 2015 WL 1277933 (M.D. Fla. March 20, 2015). He asserts that his conduct in responding to Anthony's attempted suicide is similar to that of an officer who received qualified immunity in *Olson* and that he too should benefit from that same protection.

---

[11] "In this circuit, a serious medical need is considered 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Melton*, 841 F.3d at 1221–22 (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994), *overruled in part on other grounds by Hope v. Pelzer*, 536 U.S. 730, 122 (2002) (page number omitted). The Deputy does not argue here that Anthony did not have a serious medical need.

However, Deputy Spicher was not in the same position as the officer who received immunity; rather he was like the ones who didn't.

In *Olson*, City of Oviedo police officers instructed a distressed woman with a known history of mental illness to enter her residence unaccompanied to retrieve her driver's license. 2015 WL 1277933 at *3. After hearing a shotgun blast, officers found her lying apparently face down and, upon examination, found that she still had a pulse. *Id.* at *3–4. The victim even made a phone call for help after shooting herself and was later observed by an officer as still breathing and responsive. *Id.* at *3.

No officers provided her with medical care, however, including CPR, and they refused the help of a neighbor who was a registered nurse. *Id.* at *3–4, 10. Further, officers canceled a request for rescue vehicles and delayed her treatment by failing to update anyone in the Seminole County Emergency Communications Center as to her condition. *Id.* at *4–5. In the nearly ten minutes before rescue personnel arrived, officers spent time securing the scene, apparently leaving the rescue personnel "nothing to work with" by failing to help save the victim. *Id.* at *3–5.

The Court found that these defendants, all law enforcement officers, were not entitled to qualified immunity (on motions to dismiss) as they had prevented bystanders from providing the victim with medical care and they did not attempt to provide any such care themselves. *Id.* at *10–11 ("While the Oviedo Officers on scene had to act rapidly under pressure to provide first aid to Ms. Olson, they failed to undertake any lifesaving actions."). Conversely, the Court found that one of the officers was entitled to qualified immunity, as he arrived on the scene after the incident and had little time to assess the situation. *Id.* at *11.

That officer arrived on the scene after the events leading up to the suicide attempt. Further, the officer also proceeded based on the inaction of other officers, whose unconcerned attitudes and

13

actions suggested that the victim was already deceased (or at least beyond assistance). *Id.* (noting that the officer who was entitled to qualified immunity "had one minute to take stock of the situation, to attempt to comprehend the medical condition of the victim, and to decide whether to take action" and that the officer "could reasonably rely upon the non-action by his colleagues as indicating the victim was deceased or beyond assistance").

Deputy Spicher claims that he should benefit from qualified immunity because he, like the officer in *Olson* who was entitled to such immunity, had limited time to assess and react to Anthony's situation, thus suggesting that he did not violate a constitutional right. (Doc. 16 at 11–12). To be sure, Deputy Spicher arrived on the scene after the suicide attempt and, between that moment and the arrival of the Fire Rescue personnel, he had about one minute to assess the situation and to determine how to proceed.

But here, contrary to the officer in *Olson* that Deputy Spicher seeks to compare himself too, as alleged Deputy Spicher was apparently aware that he was responding to a suicide threat (given the 911 call) and that the victim could therefore likely be in need of life-saving support. Indeed, having arrived to see neighbors already performing CPR, he had good reason to believe that Anthony was, or at the very least could, still be alive and was in need of medical attention.

Even under these circumstances, the Plaintiff alleges that Deputy Spicher stopped the neighbors' CPR treatment, prevented rescue personnel from attending to Anthony, and did not attempt to provide any medical treatment himself (much less, it can be inferred, even check to see if Anthony was still alive or even ask Anthony's family or neighbors if he was). And it is currently unknown how much time the Deputy delayed Warren, the one paramedic who was *eventually* allowed to approach Anthony. Further, "without checking on Anthony," he directed other

emergency units to slow down and he made this direction—perhaps—before he even arrived on the scene.

Thus, Plaintiff has made a plausible claim that Deputy Spicher acted with deliberate indifference to Anthony's medical needs and those actions, as pled, shock the conscience. While the facts may play out differently in discovery, the Deputy's motion to dismiss is due to be denied.

2. Plaintiff asserts that the overall egregiousness of Deputy Spicher's conduct shows that the Deputy plausibly violated a clearly established constitutional right. (Doc. 21 at 11). Under the facts as plead, I submit Plaintiff is correct.

A plaintiff can demonstrate that a constitutional right was established by showing that: (1) a "materially similar case has already been decided, giving notice to the police," (2) a "broader, clearly established principle should control the novel facts in th[e] situation," or (3) the "case fits within the exception of conduct which so obviously violates the constitution that prior case law is unnecessary." *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005). As was the case in *Olson*, where the Court held that the officers "should not have needed case law" to know that the individual was at risk of losing her life and was in need of immediate medical attention, under the facts alleged (and as previously stated), the same is true here. *See Olson*, 2015 WL 1277933, at *12.[12] Here, in response to a suicide attempt Deputy Spicher stopped, denied, impeded, and

---

[12] *See also Lancaster v. Monroe Cty., Ala.*, 116 F.3d 1419, 1425 (11th Cir. 1997), *overruled on other grounds by LeFrere v. Quezada*, 588 F.3d 1317, 1318 (11th Cir. 2009) ("The case law also had clearly established before this case arose that an official acts with deliberate indifference when he intentionally delays providing an inmate with access to medical treatment, knowing that the inmate has a life-threatening condition or an urgent medical condition that would be exacerbated by delay."); *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994), *overruled in part on other grounds by Hope v. Pelzer*, 536 U.S. 730, 122 (2002) ("Cases stating a constitutional claim for immediate or emergency medical attention have concerned medical needs that are obvious even to a layperson because they involve life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem.").

15

delayed medical treatment. *See id.*[13] Accordingly, as Deputy Spicher's actions plausibly violated Anthony's well-established constitutional right to bodily integrity and life (at least under the facts plead), he cannot benefit from qualified immunity for the purposes of the motion before the Court.

### B. Punitive Damages for Medical Indifference Under § 1983

Deputy Spicher also asserts that Plaintiff's complaint should be dismissed as to her request for punitive damages. (Docs. 9 at ¶50(g); *see* 16 at 15 ("The Plaintiff's Amended Complaint has failed to state sufficient facts beyond mere conclusions to support a claim for punitive damages against Deputy Spicher.")). "Punitive damages are appropriate under § 1983 'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves callous or reckless indifference to the federally protected rights of others.'" *Wright v. Sheppard*, 919 F.2d 665, 670 (11th Cir. 1990) (quoting *H.C. by Hewett v. Jarrard*, 786 F.2d 1080, 1089 (11th Cir. 1986). "A plaintiff is not entitled to punitive damages as a matter of right." *Id.* at 671.

Generally, "[n]o matter how egregious the defendant's conduct, whether to award punitive[ damages] is left to the factfinder." *Id.* The alleged facts here are adequate to find that Deputy Spicher's conduct rose to the level needed for punitive damage, at least for purposes of the instant motion. Certainly his alleged knowledge of Anthony's suicide threat and the neighbors CPR treatment (that he ordered to stop), coupled with his professional and medical experience and

---

[13] *See also Melton*, 841 F.3d at 1229, 1223, 1232 (noting that this Circuit "has repeatedly held that an unreasonable delay in treating a serious medical need . . . constitutes deliberate indifference," that "it is clearly established that a delay in treatment which results in additional pain and suffering constitutes deliberate indifference," and that "[a] defendant who unreasonably fails to respond or refuses to treat an inmate's need for medical care or one who delays necessary treatment without explanation or for non-medical reasons may also exhibit deliberate indifference."); *Farrow v. West*, 320 F.3d 1235, 1247 (11th Cir. 2003) ("Whether [a] delay in treatment was tolerable 'depends on the nature of the medical need and the reason for the delay.'") (quoting *Harris v. Coweta County*, 21 F.3d 388, 393–94 (11th Cir.1994)); *Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990) (noting that with some types of injuries, "it may be that deliberately indifferent delay, no matter how brief, would render defendants liable as if they had inflicted the pain themselves").

16

training and his apparent failure to evaluate whether Anthony was still alive, would suggest that he was recklessly indifferent to, and callous towards, Anthony's needs. And his own denial of medical treatment, his preventing Marion County Fire Rescue personnel from treating Anthony, and his decision to slow down the other responding units without checking on Anthony would imply a similar culpability. Given all of this, Deputy Spicher's request to dismiss Plaintiff's request for punitive damages should be denied at this time. *Cf. Moulton v. DeSue*, 966 F. Supp. 2d 1298, 1310 (M.D. Fla. 2012) (stating that a reasonable jury could conclude that Defendants' actions constituted reckless indifference and therefore the claims for punitive damages should be left to the jury).

### C. Wrongful Death Under §§ 768.16–28

Deputy Spicher also claims statutory immunity for Plaintiff's wrongful death allegations. (Doc. 16 at 14) ("Count III of the Plaintiff's Amended Complaint alleges mere conclusory allegations under §768.28(9)(a) and pleads nothing more than the bare elements of malice, bad faith and wanton and willful disregard."). Florida Statute § 768.28 provides immunity for officers who act in good faith; without malice; and, without wanton and willful disregard of human rights, safety, or property:

> No officer, employee, or agent of the state or any of its subdivisions shall be held personally liable in tort or named as a party defendant in any action for any injury or damage suffered as a result of any act, event, or omission of action in the scope of her or his employment or function, unless such officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

Fla. Stat. § 768.28(9)(a). Plaintiff alleges in her complaint that the Deputy's conduct rose to the level of wanton and willful disregard.

Under Florida law, wanton and willful conduct is generally defined as being "'more than ordinary negligence but less than deliberate conduct.'" *Holloway v. City of Orlando*, No: 6:15-cv-

17

129-ORL-40GJK, 2016 WL 4369958, at *7 (M.D. Fla. Aug.16, 2016) (quoting *Lemay v. Kondrk*, 923 So. 2d 1188, 1192 (Fla. 5th DCA, 2006)). Specifically, to meet this standard, the plaintiff must show that "'the defendant had knowledge of existing conditions, was conscience from such knowledge that injury would likely or probably result from his conduct, and with reckless indifference to the consequences consciously and intentionally does some wrongful act or omits to discharge some duty which produces the injurious result.'" *Id.* (quoting *Lemay*, 923 So. 2d at 1192).

For the same reasons the Court states that Plaintiff has plead a plausible substantive due process claim—conscience shocking actions—the Deputy's request for statutory immunity should be denied at this stage. That is, given the egregiousness of the Deputy's alleged conduct (as discussed *supra*), Plaintiff has alleged sufficient facts in her complaint to overcome dismissal under statutory immunity for her wrongful death claim. *Cf., e.g.*, *Holloway*, 2016 WL 4369958, at *7 (denying an officer's immunity request on the officer's summary judgment motion when the plaintiff "did not commit a crime and complied with all of [the officer's] commands, but was nevertheless met with force, including a kick to his groin and mace sprayed into his eyes").

## IV. RECOMMENDATION

Accordingly, it is respectfully **RECOMMENDED** that the motion to dismiss (Doc. 16) should be denied in its entirety.

**Recommended** in Ocala, Florida on August 11, 2017.

PHILIP R. LAMMENS
United States Magistrate Judge

Copies furnished to:

Counsel of Record
Unrepresented Parties