# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## OCALA DIVISION

JOLENE WALDRON, as the
Personal Representative of the
Estate of Anthony R. Ybarra, Jr. a
minor,

     Plaintiff,

v.                                   Case No. 5:16-cv-658-Oc-32PRL

GREGORY SPICHER, Deputy,
individually and BILLY WOODS,
Marion County Sheriff, in his
Official Capacity,

     Defendants.

_____

# O R D E R

In this § 1983 civil rights and state wrongful death case, the Court must determine whether a law enforcement officer who prevents civilian bystanders from performing CPR on a suicidal teenager without explanation, is nonetheless entitled to qualified and statutory immunity. After Plaintiff Jolene Waldron's fourteen-year-old son, Anthony Ybarra, Jr., hung himself, neighbors and family cut him down and began administering CPR—until Defendant Deputy Gregory Spicher arrived and ordered them to stop. Anthony subsequently died, and Waldron filed suit against Spicher in his individual capacity and against the

Sheriff of Marion County, now Billy Woods, in his official capacity. Waldron has asserted a § 1983 claim against Spicher, and Florida wrongful death claims against Spicher and Woods. Currently before the Court are Spicher's Motion for Summary Judgment, (Doc. 48), Woods's Motion for Summary Judgment, (Doc. 45), Defendants' Joint Motion to Exclude the Opinions of the Plaintiff's Expert Mazyar Rouhani, M.D., (Doc. 41), and Waldron's Motion to Strike or Limit Opinion Testimony Regarding Defendants' Expert, Dr. Kris Sperry, (Doc. 42). The Court received responses to each motion. (Docs. 43; 44; 54).

## I. BACKGROUND

On November 14, 2014, Anthony was informed that he was no longer allowed to attend Belleview High School.[1] (Doc. 47-1 at 44–47). The news upset Anthony, and on the ride home he and his mother picked up Anthony's younger sister, but no one spoke about the meeting. (Doc. 47-1 at 61–64, 124–26). They arrived home around 3:00 p.m., (Doc. 47-1 at 61–62), but Waldron left around 3:40 p.m. to pick up her other son from school. (Doc. 47-1 at 64). The school was close by, and she returned home around 3:50 p.m. (Doc. 47-1 at 65).

Waldron noticed that Anthony was not in the living room or kitchen, so she asked Anthony's sister where he went. (Doc. 47-1 at 64). She stated that

---

[1] Anthony had emotional and behavioral disabilities and was continually getting in trouble at Belleview. His behavior resulted in a meeting with school officials on the day of his death. He hung himself less than three hours later. (See Doc. 47-1 at 23–61).

Anthony had run outside as soon as Waldron had left. (Doc. 47-1 at 64). Waldron thought that Anthony was trying to clear his head, so after yelling for him with no response, she went inside to make a sandwich. (Doc. 47-1 at 65–66). Soon thereafter, Anthony's younger brother said that he could see Anthony out his bedroom window, but that Anthony's feet were not touching the ground. (Doc. 47-1 at 66).

Waldron immediately ran outside followed by her two other children, where she found Anthony hanging from a tree by a ligature created from two belts tied together. (Doc. 47-1 at 67–68). When she reached him, Anthony was still swaying. (Doc. 47-1 at 72–73). Anthony's brother ran back to the house to get Waldron's phone, but he could not find it. (Doc. 47-1 at 70). So Waldron ran back to the house and got her phone, but her call to 911 was disconnected. (Doc. 47-1 at 69). Anthony's brother ran and got a knife to cut Anthony down, but he could not reach the belts. (Doc. 47-1 at 70).

During this time, Waldron's neighbors, Christina and Ronald Jay Timson, heard her screams and came over. (Doc. 47-1 at 71–72). It was approximately one minute from when Mr. Timson originally heard Waldron's screams to when he arrived at the scene. (Doc. 48-2 at 13). Mrs. Timson called 911, (Doc. 52), while Mr. Timson, a former paramedic, summoned Waldron to get a knife so he could cut Anthony down. (Docs. 47-1 at 72; 48-1 at 12). Waldron did not see the knife that Anthony's brother had retrieved, so she ran back to her house and

grabbed a butcher knife, which Mr. Timson used to free Anthony from the ligature. (Docs. 47-1 at 71–72).

When they cut Anthony down, Waldron stated that he was not cyanotic,[2] and after Mr. Timson began CPR, Waldron observed Anthony exhale at least once. (Doc. 47-1 at 72–73). Mr. Timson checked Anthony's body temperature, airway, and pulse.[3] (Doc. 48-2 at 13). Mr. Timson could not tell if Anthony was cyanotic because of Anthony's ethnicity, which he described as some type of "African-American descent . . . some type of nonwhite ethnicity." (Doc. 48-2 at 13). He observed that Anthony had a very faint pulse on his carotid artery and was not cold to the touch. (Doc. 48-2 at 14, 20).

While Mr. Timson was performing CPR, Waldron called Karen VanEs, her boyfriend's mother, who was a nurse and lived nearby. (Doc. 47-1 at 72–73). Mrs. VanEs remembers her husband, Steven VanEs, answering the phone at 4:04 p.m. (Doc. 48-3 at 25). She remembered the specific time because she had been working nights and was awoken by the sound of someone yelling on the

---

[2] Cyanotic refers to the blue color a person becomes when their tissue is not receiving sufficient levels of oxygen. (Doc. 48-6 at 17).

[3] Mr. and Mrs. Timson both acknowledged that Mr. Timson has a liver condition from which he almost died. The condition causes him to have both short and long-term memory loss. He remembers some things specifically, but for others he was just "putting the pieces together." This Order only uses his testimony that was corroborated by either other testimony or Mr. Timson's statement to the police immediately following the event.

phone. (Doc. 48-3 at 25). Mr. and Mrs. VanEs arrived less than three minutes later, (Doc. 48-3 at 26), and Mrs. VanEs jumped out of the car and began assisting Mr. Timson with CPR. (Doc. 47-1 at 76). The 911 recording indicates that Mr. Timson performed CPR for at least four minutes before Mrs. VanEs arrived. (Doc. 51). Mrs. VanEs stated that when she arrived, Anthony was not blue and was warm. (Doc. 48-3 at 54–55).

A few minutes after Mrs. VanEs reached Anthony, Deputy Spicher arrived on scene.[4] (Docs. 48-3 at 36; 47-1 at 77). Waldron testified that Spicher walked up to the scene, and without examining Anthony, ordered Mrs. VanEs and Mr. Timson to stop CPR. (Doc. 47-1 at 78, 140–41). According to Waldron, Spicher's initial command fell on deaf ears, until he reiterated, "I said stop and back away." (Doc. 47-1 at 79, 142). Mr. Timson also recalled that Spicher showed up, surveyed the scene, and asked that he and Mrs. VanEs step away. (Doc. 48-2 at 21). Mrs. VanEs remembers Spicher telling her and Mr. Timson to step away, but that she protested, claiming she felt a radial pulse. (Doc. 48-3 at 36–37). Spicher told her she felt a pulse because she was doing CPR. (Doc. 48-3 at

---

[4] Mrs. VanEs testified that she and Mr. Timson were on their fifth round of compressions, at an interval of thirty compressions for every two breaths, when Spicher arrived. She estimated this to be between three and four minutes. (Doc. 48-3 at 36–37). Waldron stated that a "couple minutes" elapsed before Spicher arrived. (Doc. 47-1 at 77). However, listening to the 911 audio recording and using the recording's timer, it appears as though Spicher arrives less than a minute after Mrs. VanEs. (Doc. 52).

37). Mr. VanEs remembers walking up to Anthony at the moment Spicher told Mrs. VanEs and Mr. Timson to stop CPR, and in response to Mrs. VanEs's objection he heard Spicher respond: "I said to stop." (Doc. 48-4 at 16–17). At that point, Mrs. VanEs and Mr. Timson ceased CPR, (Doc. 48-2 at 22), and Mr. VanEs heard Spicher call over his radio that it was a 10-7 and not to rush,[5] (Doc. 48-4 at 17). Mrs. Timson also saw Mr. Timson back away from Anthony as soon as Spicher arrived, but she did not hear what was said. (Doc. 48-1 at 17). No one saw Spicher check Anthony for signs of life. (Docs. 47-1 at 78, 140–41; 48-2 at 21; 48-3 at 69; 48-4 at 33–34; 48-5 at 18).

A short but indeterminate amount of time later,[6] a fire truck arrived, followed shortly after by an ambulance. The team of EMTs from the firetruck

---

[5] A "10-7," also referred to as a "signal 7" or "code 7," means that there is a deceased individual at the scene. (Doc. 54-1 at 5).

[6] Each witness has a slightly different memory of how long it took for the Emergency Medical Technicians ("EMT") to arrive. Waldron said a few minutes elapsed between Spicher's and the EMTs' arrival. (Doc. 47-1 at 79). But she was not documenting when events occurred, and when pressed in her deposition could only say that it was a short while. (Doc. 47-1 at 79). Mrs. Timson said it was "minutes" from when Spicher arrived until the EMTs arrived. (Doc. 48-1 at 17). Mr. Timson said it was "within a minute." (Doc. 48-2 at 23). Mrs. VanEs said that "it was probably a good two to three more minutes" before EMS arrived. (Doc. 48-3 at 38). Mr. VanEs estimated that it was between three to five minutes from when Spicher halted CPR to when the paramedics arrived. (Doc. 48-4 at 18).

The Marion County Sheriff's Office "Incident Detail Report," or CAD Report, states that Spicher was assigned, en route, and arrived at 4:07:34 p.m. (Doc. 50-1 at 1–2). This timeline clearly indicates an error in the system's reporting. It is also unclear at what time Spicher declared a "signal 7"—it could

were directed to Anthony. (Docs. 48-3 at 38; 48-6 at 16). However, Spicher stopped the group and only allowed EMT Warren to approach Anthony. (Docs. 47-1 at 82; 48-6 at 16). Warren physically assessed Anthony and noted that he was severely cyanotic, his neck was elongated, his arms, legs, neck, back, and abdomen were warm, and he had no lividity.[7] (Doc. 48-6 at 17–19, 41). Warren then used his Lifepak 12 monitor via fast patches to determine that Anthony had a pulseless electrical activity ("PEA") rhythm of twenty-four beats per minute. (Doc. 48-6 at 16, 20–21); (see also Doc. 47-1 at 82).

Upon discovering that Anthony had a PEA, Warren attempted to have Spicher allow Lieutenant Kevin Christensen, the senior paramedic, to come over to Anthony, but Spicher was on the phone and did not hear Warren. (Doc. 48-6 at 23). Warren yelled louder, which alerted Christensen, and he immediately went to Warren and Anthony. (Doc. 48-6 at 23). The two began

---

have been at 4:07:34 p.m. or at 4:08:14 p.m. (Doc. 50-1 at 2). Defendants claim that the "signal 7" was called in at 4:08:14. The "Prehospital Care Report Summary" by Marion County Fire Rescue EMT David Warren states that his team was dispatched at 4:01:58 p.m., arrived on scene at 4:08:27 p.m., and made patient contact at 4:10:00 p.m. (Doc. 48-7 at 1). Mr. Timson stated that after he stopped CPR and began walking away, the EMTs were coming through the brush. (Doc. 48-2 at 34). Thus, there is no way of knowing with precision how long Spicher was actually on the scene and how much time elapsed between when CPR was halted and when the EMTs arrived.

[7] Warren describes lividity as "pooling on his person, of blood, a darker color, which would indicate a longer downtime of cardiac arrest." (Doc. 48-6 at 19).

CPR, and the remaining paramedic from Warren's group, and the ambulance's rescue crew, went to assist. (Doc. 48-6 at 23). The EMTs placed Anthony on a stretcher and transported him via ambulance to The Villages Regional Hospital. (Doc. 48-6 at 24). On the way to the hospital, Anthony sustained return of spontaneous circulation ("ROSC"). (Doc. 48-6 at 28).

After the ambulance departed, Spicher approached Waldron and told her: "I don't want to get your hopes up, but they found a pulse." (Doc. 47-1 at 83). Later at the hospital, Spicher told Waldron: "It could have been worse; there could have been a loaded gun in the house." (Doc. 47-1 at 87). Anthony was air lifted to Shands Hospital in Gainesville, Florida, where he survived for more than a week. (Doc. 47-1 at 87–88). But unfortunately, Anthony died without regaining consciousness.

Spicher's recollection of several important events differs from other witnesses'. First, Spicher states that he checked Anthony for signs of life. (Docs. 48-8 at 2–3; 54-1 at 9, 13). Spicher claims that Anthony was very cyanotic, had no carotid pulse, had pooling and muddling of the blood along his chest and back, and had cold limbs. (Docs. 48-8 at 2–3; 54-1 at 13). Second, although Spicher agreed that he did not have the authority to declare someone deceased, he claims it was a custom for Marion County Sheriff's Office deputies to do so. (Doc. 54-1 at 7).

After the incident, the Marion County Sheriff's Office conducted an Internal Affairs investigation which concluded that "Spicher's actions at the time of his arrival, in as far as his commands to civilians, were not proper as to his role of a law enforcement officer and the Marion County Sheriff's Office." (Doc. 45-2 at 15). Additionally, EMT Warren stated that Anthony did not meet the "death-in-the-field" protocol because Anthony had cardiac activity. (Doc. 48-6 at 50). In support of its decision, the Internal Affairs report states: "CPR training will teach you that you don't cease CPR once it begins, unless the person administering it is relieved by medical personnel or becomes exhausted. Deputy Spicher made, what he believed at the time, a correct decision when giving the order [to cease CPR]; however, he lacked the facts to do so." (Doc. 45-2 at 14).

Waldron filed a three-count Amended Complaint, alleging medical indifference in violation of 42 U.S.C. § 1983 against Spicher (Count I), wrongful death under Florida law against Woods (Count II), and wrongful death under Florida law against Spicher (Count III). (Doc. 9).

## II. SUMMARY JUDGMENT

Spicher seeks summary judgment in his favor, claiming he is entitled to qualified immunity because the undisputed material facts show that he did not violate a clearly established constitutional right. (Doc. 48 at 2). Additionally, Spicher asserts that he is entitled to statutory immunity on the Florida

wrongful death claim, and that the evidence fails to support a claim for punitive damages. (Doc. 48 at 2). Woods claims that Spicher was not negligent, and therefore he cannot be vicariously liable, or alternatively, that he is entitled to statutory immunity. (Doc. 45 at 5–6).

## A. Deputy Spicher's Qualified Immunity Claim

Spicher claims that he is entitled to qualified immunity because his actions did not amount to deliberate indifference to a serious medical need. (Doc. 48 at 15). Further, he asserts that his actions were reasonable under the circumstances and that the brief time CPR was halted does not shock the conscience. (Doc. 48 at 16–17).

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects all but the plainly incompetent or those who knowingly violate the law." Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011) (quotations omitted) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)). The government official has the initial burden of establishing his entitlement to qualified immunity by proving that he was acting within the scope of his discretionary authority. Estate of Cummings v. Davenport, No. 17-13999, 2018 WL 4705723, at *3 (11th Cir. Oct. 2, 2018). Once proven, the burden shifts to the plaintiff, who, to overcome qualified immunity, must demonstrate that the government actor violated a "clearly established statutory or constitutional right[] of which

a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). The parties do not dispute that Spicher was acting within his discretionary authority.[8] (Docs. 48 at 12; 54 at 7, 18–19). Instead, Waldron asserts that Spicher violated Anthony's Fourteenth Amendment substantive due process rights when he ordered the discontinuation of CPR and did not allow all the responding EMTs to assist Anthony.

    1. <u>Waldron has put forward a viable Fourteenth Amendment substantive due process claim</u>.

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due

---

[8] Although Waldron concedes that Spicher was acting within the scope of his discretionary authority, the Court is not so sure. In <u>Davenport</u>, a case decided as this opinion was being finalized, the Eleventh Circuit stated that an action is within an official's discretionary authority, if it was "(1) undertaken pursuant to the performance of his duties, and (2) within the scope of his authority." <u>Davenport</u>, 2018 WL 4705723, at *3 (quotation marks omitted) (quoting <u>Harbert Int'l, Inc. v. James</u>, 157 F.3d 1271, 1282 (11th Cir. 1998)). The Eleventh Circuit held that a prison warden exceeded the scope of his authority under Alabama law by making end-of-life care decisions for an inmate, despite having legal authority to make certain other medical decisions. <u>Id.</u> at *5–6. Here, it is likely that Spicher does not have legal authority under Florida law to declare someone dead, and doing so may have exceeded the scope of his authority. <u>See</u> <u>id.</u> at *3; Op. Att'y Gen. Fla. 078-46 (1978) ("No statute authorizes or requires a sheriff, deputy sheriff, or certified emergency medical technician to officially pronounce or officially declare a person dead. No immunity is provided by law to a sheriff, deputy sheriff, or certified emergency medical technician who undertakes to declare or pronounce a person dead."). However, because no party raised the issue and it would not change the outcome, the Court declines to address it further.

process of law." U.S. Const. amend. XIV, § 1. The Due Process Clause "was intended to prevent government officials from abusing their power, or employing it as an instrument of oppression." <u>Waddell v. Hendry Cty. Sheriff's Office</u>, 329 F.3d 1300, 1305 (11th Cir. 2003) (quotation marks omitted) (quoting <u>Cty. of Sacramento v. Lewis</u>, 523 U.S. 833 (1998)). However, it is only "a limitation on the State's power to act" and "[n]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by [non-state] actors." <u>Id.</u>

Although the Due Process Clause "does not confer an entitlement to such governmental aid as may be necessary to realize all the advantages of [life, liberty, and property]," it does afford protection against unwarranted government interference. <u>DeShaney v. Winnebago Cty. Dep't of Soc. Servs.</u>, 489 U.S. 189, 196 (1989) (quotation marks omitted) (alterations omitted) (quoting <u>Harris v. McRae</u>, 448 U.S. 297, 317–18 (1980)). Originally, there were two circumstances where the Constitution imposed an affirmative duty of care on the state: (1) where the state takes a person into custody, confining him against his will and leaving him unable to care for himself; and (2) when the state creates the danger or renders a person more vulnerable to an existing danger. <u>Id.</u> at 198–99; <u>Waddell</u>, 329 F.3d at 1305; <u>K.W. v. Lee Cty. Sch. Bd.</u>, 67 F. Supp. 3d 1330, 1336 (M.D. Fla. 2014). However, the "state-created danger" doctrine has been replaced, and "conduct by a government actor [in a noncustodial

setting] will rise to the level of a substantive due process violation only if the act can be characterized as arbitrary or conscience shocking in a constitutional sense."[9] Waddell, 329 F.3d at 1305.

Here, Anthony was not in custody; rather, Waldron asserts that Spicher's actions shock the conscience. (Doc. 54 at 12–13). The Supreme Court has stated that "the measure of what is conscience shocking is no calibrated yard stick. . . ."[10] Lewis, 523 U.S. at 847. The Eleventh Circuit, in Waddell, set forth

---

[9] The Eleventh Circuit determined that the "special danger" and "special relationship" doctrines were superseded by the Supreme Court's decision in Collins v. City of Harker Heights, 503 U.S. 115 (1992). Waddell, 329 F.3d at 1305 (citing White v. Lemacks, 183 F.3d 1253, 1257–59 (11th Cir. 1999)). Other circuits, similarly, have declined to adopt the "state-created danger" theory. See Hasenfus v. LaJeunesse, 175 F.3d 68, 73 (1st Cir. 1999); Saenz v. City of McAllen, 396 F. App'x 173, 178 (5th Cir. 2010) (unpublished decision) (discussing the history of the Fifth Circuit's reluctance to adopt the state-created danger theory). However, despite the Eleventh Circuit's holding that Collins abrogated the "special danger" and "special relationship" doctrines, many courts still allow them. See, e.g., Kedra v. Schroeter, 876 F.3d 424, 436 (3d Cir. 2017), cert. denied, 138 S. Ct. 1990 (2018); Maxwell v. Cty. of San Diego, 708 F.3d 1075, 1082–83 (9th Cir. 2013); Robinson v. Lioi, 536 F. App'x 340, 346 (4th Cir. 2013); Gray v. Univ. of Colo. Hosp. Auth., 672 F.3d 909, 922 (10th Cir. 2012); Okin v. Vill. of Cornwall-On-Hudson Police Dep't, 577 F.3d 415, 428 (2d Cir. 2009); King ex rel. King v. E. St. Louis Sch. Dist. 189, 496 F.3d 812, 818 (7th Cir. 2007) (applying a "state-created danger" doctrine, but requiring as an element that the affirmative action "shock the conscience"); Jones v. Reynolds, 438 F.3d 685, 690 (6th Cir. 2006).

[10] The "shocks-the-conscience" standard has been criticized. See, e.g., Lewis, 523 U.S. at 861–62 (Scalia, J., concurring). In expressing his dissatisfaction with the standard, Judge Richard Posner of the Seventh Circuit has proposed a much simpler standard for substantive due process claims:

> Shouldn't it be enough to say that it violates the due process clause for a government employee acting within the scope of his

general parameters for showing a substantive due process violation in a noncustodial setting:

> [A] showing of negligence is insufficient to make out a constitutional due process claim. <u>Lewis</u>, 523 U.S. 833, 118 S. Ct. 1708, 1718, 140 L. Ed. 2d 1043 (1998). And even intentional wrongs seldom violate the Due Process Clause. Acts "intended to injure in some way unjustifiable by any government interest" are "most likely to rise to the conscience-shocking level." <u>Id.</u> But, even conduct by a government actor that would amount to an intentional tort under state law will rise to the level of a substantive due process violation only if it also "shocks the conscience." <u>Dacosta v. Nwachukwa</u>, 304 F.3d 1045, 1048 (11th Cir. 2002).
>
> "[O]nly the most egregious official conduct can be said to be arbitrary in the constitutional sense." <u>Lewis</u>, 118 S. Ct. at 1716 (quotation and citation omitted). Determinations of what is egregious conduct must not be made in the glow of hindsight; decisions made by a government actor <u>must be egregious—that is, shock the conscience—at the time the government actor made the decision.</u>

<u>Waddell</u>, 329 F.3d at 1305.

The Eleventh Circuit then looks to the deliberate indifference standard utilized in custodial situations to provide a foundation for analyzing a substantive due process claim in a noncustodial setting. <u>Id.</u> ("In this non-custodial setting, a substantive due process violation would, at the very least,

---

> employment to commit a reckless act that by gratuitously endangering a person results in an injury to that person? Are there not virtues in simplicity, even in law?

<u>Slade v. Bd. of Sch. Dirs. of City of Milwaukee</u>, 702 F.3d 1027, 1033 (7th Cir. 2012).

require a showing of deliberate indifference to an extremely great risk of serious injury to someone in Plaintiffs' position."). However, in using the deliberate indifference standard, the Eleventh Circuit appears to require something additional to rise to the level of "conscience-shocking." <u>See</u> <u>Davis v. Carter</u>, 555 F.3d 979, 983 (11th Cir. 2009) (stating that in the school setting, deliberate indifference is insufficient to shock the conscience, but then stating in a footnote that in other situations deliberate indifference may be sufficient); <u>Waddell</u>, 329 F.3d at 1306 (stating in a footnote that the deliberate indifference standard may be too low). We begin first by inquiring whether Spicher's actions meet the deliberate indifference standard.

In custodial settings, the Eighth and Fourteenth Amendments protect inmates and detainees from prison officials' deliberate indifference to serious medical needs.[11] <u>Dang ex rel. Dang v. Sheriff, Seminole Cty.</u>, 871 F.3d 1272, 1279 (11th Cir. 2017). In such situations, deliberate indifference to an extremely great risk of injury has three elements: "(1) subjective knowledge of

_____

[11] The Eleventh Circuit defines "a serious medical need [a]s . . . one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention[,]" and "that, if left unattended, poses a substantial risk of serious harm." <u>Melton v. Abston</u>, 841 F.3d 1207, 1221–22 (11th Cir. 2016) (quotation marks omitted) (quoting <u>Hill v. Dekalb Reg'l Youth Det. Ctr.</u>, 40 F.3d 1176, 1187 (11th Cir. 1994), <u>overruled on other grounds by</u> <u>Hope</u>, 536 U.S. at 739, <u>and</u> <u>Mann v. Taser Intern., Inc.</u>, 588 F.3d 1291, 1307 (11th Cir. 2009)). It was objectively reasonable that Anthony, who was not breathing, had a serious medical need, and that Spicher knew it. (Doc. 48-8 ¶ 10).

a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence."[12] Id. at 1280 (quoting McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999)); Waddell, 329 F.3d at 1306. Conduct constituting deliberate indifference to serious medical needs includes:

> (1) grossly inadequate care; (2) a decision to take an easier but less efficacious course of treatment; and (3) medical care that is so cursory as to amount to no treatment at all. A defendant who unreasonably fails to respond or refuses to treat an inmate's need

---

[12] Some Eleventh Circuit opinions have defined the third element as "more than gross negligence." See, e.g., Townsend v. Jefferson Cty., 601 F.3d 1152, 1158 (11th Cir. 2010). However, the Eleventh Circuit in Melton stated that "more than gross negligence" misstates the law:

> In Townsend v. Jefferson Cty., 601 F.3d 1152, 1158 (11th Cir. 2010), a panel of this Court stated that under Cottrell v. Caldwell, 85 F.3d 1480, 1490 (11th Cir. 1996) and Farmer v. Brennan, 511 U.S. 825, 847, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994), "a claim of deliberate indifference requires proof of more than gross negligence." We disagree with that conclusion for three main reasons. First, the "more than mere negligence" standard in McElligott is more consistent with Farmer than the "more than gross negligence" standard in Townsend. Farmer, 511 U.S. at 847, 114 S. Ct. 1970 (holding that deliberate indifference requires subjective risk of serious harm and disregard of that risk by "failing to take reasonable measures to abate it"). Second, the phrase "more than gross negligence" is not found in either Cottrell or Farmer. Third, the panel in Cottrell found no deliberate indifference where the plaintiff failed to prove the "subjective intent element prescribed in Farmer" and, therefore, did not reach whether Farmer requires "more than mere negligence" or "more than gross negligence." Cottrell, 85 F.3d at 1491–92. Because McElligott is the earliest Eleventh Circuit case after Farmer to directly address the degree of culpability required under Farmer, we must follow it. Morrison v. Amway Corp., 323 F.3d 920, 929 (11th Cir. 2003).

Melton, 841 F.3d at 1223 n.2.

for medical care or one who delays necessary treatment without explanation or for non-medical reasons may also exhibit deliberate indifference.

Melton, 841 F.3d at 1223 (citations omitted);

"An official disregards a serious risk by more than mere negligence when he or she knows that an inmate is in serious need of medical care, but he or she fails or refuses to obtain medical treatment for the inmate." Dang, 871 F.3d at 1280 (alterations adopted) (quotation marks omitted) (quoting Lancaster v. Monroe Cty., 116 F.3d 1419, 1425 (11th Cir. 1997), overruled on other grounds by LeFrere v. Quezada, 588 F.3d 1317, 1318 (11th Cir. 2009)). In situations where medical care is provided, a government official may nonetheless act with deliberate indifference by delaying treatment without a valid reason. Id. In determining whether an officer's act or omission exceeds mere negligence, the act or omission must be scrutinized in the context of the medical need. See also Bozeman v. Orum, 422 F.3d 1265, 1273 (11th Cir. 2005), overruled on other grounds by Kingsley v. Hendrickson, 135 S. Ct. 2466 (2015). "A delay in care for known unconsciousness brought on by asphyxiation is especially time-sensitive. . . . Still, the right reason for the delay can make a delay of any duration tolerable." Id. In Bozeman, prison guards could "offer no explanation— medical or non-medical—for the failure to (1) check [the inmate's] breathing or pulse; (2) call for medical assistance; or (3) administer CPR themselves . . . ." Id. The Eleventh Circuit held that "[w]hen prison guards ignore without

explanation a prisoner's serious medical condition that is known or obvious to them, the trier of fact may infer deliberate indifference." Id. (quotation marks omitted) (quoting Harris v. Coweta Cty., 21 F.3d 388, 393 (11th Cir. 1994)) (holding that officers were deliberately indifferent for waiting fourteen minutes before summoning medical care for an unconscious inmate).

Spicher's actions were deliberately indifferent to Anthony's serious medical need. See Dang, 871 F.3d at 1280; Bozeman, 422 F.3d at 1273. Spicher acknowledged Anthony's serious medical condition, (Doc. 48-8 ¶ 10), and with no legitimate "explanation—medical or non-medical—" prevented time-critical life-saving efforts, Bozeman, 422 F.3d at 1273. Given the gravity of Anthony's need, the decision to disregard the risk and to stop CPR without reason exceeds negligence. See Bozeman, 422 F.3d at 1273. However, even though Spicher's actions constitute deliberate indifference, that is only the foundation for potential liability in a noncustodial substantive due process claim. Waddell, 329 F.3d at 1305 & n.5. For qualified immunity to be unavailable, Spicher's actions must go beyond the "more than mere negligence" element and shock the conscience.

Here, viewing the facts in the light most favorable to Waldron, Spicher's actions rise to the conscience-shocking level. There is no doubt that Anthony had a serious medical need, and although it is unclear whether CPR would have changed the outcome, it was unquestionable that Anthony would die without it.

In complete disregard of Anthony's serious medical needs, Spicher arrived on scene and, without assessing Anthony, ordered Mr. Timson and Mrs. VanEs to stop CPR.[13] (Docs. 7-1 at 78, 140–41; 47-1 at 78–79, 140–42; 48-2 at 21; 48-3 at 36–37, 69; 48-4 at 16–17, 33–34; 48-5 at 18). No competing emergency obligations or law enforcement concerns existed that required the immediate cessation of CPR—much less before an examination of Anthony or until EMTs arrived. See Lewis, 523 U.S. at 852–53. Spicher was even given an additional opportunity to consider and change his decision when Mrs. VanEs protested his command, telling him that she felt a pulse. (Docs. 48-3 at 36–37; 48-4 at 16–17; 54-1 at 12–14). Although there was no downside in allowing the resuscitation efforts to continue, Spicher doubled down and ordered Mr. Timson and Mrs. VanEs to move away from Anthony. (Docs. 47-1 at 79, 142; 48-4 at 16–17).

Additionally, Spicher's lack of a reasonable law enforcement purpose for stopping CPR makes his decision egregious. See Waddell, 329 F.3d at 1305. Other than his subjective belief that CPR was futile, Spicher could not articulate any reason for stopping CPR. (Doc. 54-1 at 12–14). As the Internal

---

[13] Spicher has put forth evidence, mainly his deposition and affidavit, (Docs. 54-1; 48-8), that indicate he did check Anthony for signs of life and found none. However, at this stage of the litigation the Court must view the facts in the light most favorable to Waldron, the nonmoving party. Simmons v. Bradshaw, 879 F.3d 1157, 1163–64 (11th Cir. 2018). It will be for the jury to resolve this genuine dispute of material fact. See Simmons, 879 F.3d at 1163–65.

Affairs report concluded, it is obvious to a reasonable law enforcement officer in that situation "that you don't cease CPR once it begins, unless the person administering it is relieved by medical personnel or becomes exhausted." (Doc. 45-2 at 14).[14] Despite Spicher's statement that it was common practice for deputies to declare death in "obvious" situations, (Doc. 54-1 at 7), he lacked such authority, (Docs. 45-2 at 14; 48-5 at 25–27). However, even if Spicher had the authority to do so, he did not have the facts necessary to declare Anthony dead, and nothing prevented his further triage of Anthony. (See Docs. 45-2 at 14; 48-6 at 50 (stating that Anthony's cardiac activity meant he did not meet the "death-in-the-field" protocol)); see also Lewis, 523 U.S. at 852–53. Ultimately, Spicher's command for Mr. Timson and Mrs. VanEs to stop CPR, without physically assessing Anthony and with no legitimate law enforcement purpose for doing so, is conscience-shocking. See Waddell, 329 F.3d at 1305; Olson v. Barrett, No. 6:13-CV-1886-ORL, 2015 WL 1277933, at *11 (M.D. Fla. Mar. 20, 2015) ("Lieutenant Bell, a commanding officer on scene . . . on two occasions prevented a nurse from rendering aid, which shocks the conscience.").[15]

---

[14] In his briefing, Spicher's counsel speaks of a chaotic situation with knives present as justifying Spicher's actions. (Doc. 48 at 17). However, neither Spicher's own testimony nor anything else in the record support this conclusion. While the Court can imagine a situation where a law enforcement officer might have a legitimate law enforcement or security reason for stopping CPR, in the light most favorable to Waldron, none is present here.

[15] To further demonstrate the conscience-shocking nature of Spicher's decision, the Court analogizes this case to a similar situation: If an individual

Spicher will be able to assert his qualified immunity defense at trial. Simmons, 879 F.3d at 1163–65. After hearing the evidence, a jury may decide to believe some or all of Spicher's version of events. However, viewing the facts in the light most favorable to Waldron, Spicher's actions shock the conscience.

2. Anthony's constitutional right was clearly established.

Although Spicher violated Anthony's Fourteenth Amendment substantive due process rights, qualified immunity still attaches if that right was not clearly established at the time of the alleged constitutional violation. A constitutional right can be clearly established in three ways. First, and most favored by the Eleventh Circuit, is prior case law on point that puts the government actor on notice that his conduct violates the constitution. Melton, 841 F.3d at 1221. Only decisions from the Supreme Court, the Eleventh Circuit, or the Florida Supreme Court qualify to put the government actor on notice. Id. Second, a broad principle of law can apply to a specific set of facts to put the government actor on notice. Id. However, this exception is rare, and:

> To find that a broad principle of law clearly establishes the law as to a specific set of facts, it must do so with obvious clarity to the point that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted.

_____

was shot and bystanders were putting pressure on the wound to prevent that individual from bleeding to death, a law enforcement officer's command, given without reason, that prohibited the bystanders' rescue efforts would shock the conscience.

Coffin v. Brandau, 642 F.3d 999, 1015 (11th Cir. 2011) (en banc) (quotations omitted) (quoting Vinyard v. Wilson, 311 F.3d 1340, 1351 (11th Cir. 2002)). In applying this principle, "[t]he reasoning, though not the holding of prior cases can also send the same message to reasonable officers in novel factual situations." Mercado v. City of Orlando, 407 F.3d 1152, 1159 (11th Cir. 2005) (quotations omitted) (quoting Hope, 536 U.S. at 743). Third, a plaintiff can show that "this case fits within the exception of conduct which so obviously violates th[e] constitution that prior case law is unnecessary." Id. (citations omitted). The critical inquiry is whether the law enforcement officer had fair notice that his conduct was unconstitutional. McClish v. Nugent, 483 F.3d 1231, 1248 (11th Cir. 2007).

This Court has found only one Eleventh Circuit case factually similar enough to warrant discussion. See Hamilton ex rel. Hamilton v. Cannon, 80 F.3d 1525, 1529 (11th Cir. 1996). In Hamilton, fourteen-year-old Kim Hamilton was thrown into a municipal pool and she collapsed trying to get out. Id. at 1527–28. Immediately, a trained bystander began administering CPR, and Hamilton had a pulse and shallow breaths. Id. at 1528. A sheriff's deputy arrived and ordered everyone away from the scene. Id. The bystander objected, but the deputy, who believed the EMTs would be arriving shortly, ordered her away and did not undertake CPR himself. Id. However, the EMTs were confused about where to go and did not arrive immediately. Id. The bystander

ran to her nearby home, retrieved her Red Cross CPR certification card, and returned to the pool. Id. During this time, no one provided medical treatment to Hamilton. Id. The deputy then allowed the bystander to recommence CPR, but Hamilton had already died. Id.

In the subsequent § 1983 suit by Hamilton's estate, the deputy asserted qualified immunity. Id. at 1527. The Eleventh Circuit held that on June 6, 1990, the date the events occurred, it was not clearly established that the deputy's actions were unconstitutional. Id. at 1532. The court did not declare whether such a right existed, and because Hamilton was decided when the Eleventh Circuit still recognized the "special relationship" and "special danger" doctrines, it is not dispositive either way. See Waddell, 329 F.3d at 1305.

Nonetheless, a broad legal principle can still clearly establish a right in relation to a particular factual scenario if it does so with "obvious clarity." Brandau, 642 F.3d at 1015. Although custodial situations differ because they impose a constitutional duty of care, the broad legal principle that a government actor cannot deny the ability of an individual to receive care without supplanting such care applies here. See id.; Hill, 40 F.3d at 1187 (holding that state actors violate the Eighth Amendment by delaying treatment for life threatening emergencies and in "situations where it is apparent that delay would detrimentally exacerbate the medical problem."). Supreme Court and Eleventh Circuit precedent hold that the prevention of necessary medical

treatment for an individual in custody violates the Constitution. See, e.g., Lewis, 523 U.S. at 851 ("[W]hen the State by the affirmative exercise of its power . . . renders [an individual] unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.,* . . . medical care . . .—it transgresses the substantive limits on state action . . . ." (quoting DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 200 (1989)); Estelle, 429 U.S. at 104–05; Hill, 40 F.3d at 1187.

Here, Spicher rendered Anthony unable to care for himself through the help of his family and neighbors, and at the same time failed to provide medical care. See Lewis, 523 U.S. at 851; (Docs. 45-2 at 14; 54-1 at 12–14). As a law enforcement officer, Spicher was aware that he could not use his authority to cut off medical aid to a person in need without a legitimate and reasonable purpose for doing so. See Lewis, 523 U.S. at 851. The plethora of Eighth Amendment case law makes this clear, see, e.g., Estelle, 429 U.S. at 103–04, and this specific factual situation is encompassed by that principle.

Additionally, it is obvious to any reasonable law enforcement officer that Spicher's conduct violated the Constitution. Spicher's own department found that his actions were improper and constituted a "dereliction of duty." (Doc. 45-2 at 14–15). It is obvious to any first responder that you do not cease life saving efforts absent a necessary and compelling reason to do so—case law explicitly stating such is unnecessary. Although not binding precedent, other courts have

recognized that using one's authority as a law enforcement officer to cut off necessary aid is obviously unconstitutional. See Ross v. United States, 910 F.2d 1422, 1433 (7th Cir. 1990) (holding that "a reasonable police officer . . . should have known that he could not use [his] authority to prevent private rescue efforts."); Olson, 2015 WL 1277933, at *11 (finding that case law was unnecessary for officers who prevented bystanders from helping an unaided gunshot victim to know that their conduct was unconstitutional). Therefore, taking the facts in the light most favorable to Waldron, Spicher was on notice that his actions were unconstitutional. Accordingly, Spicher is not entitled to qualified immunity.

### B. Punitive Damages

Spicher also seeks summary judgment on Waldron's demand for punitive damages related to her § 1983 claim. Spicher argues that "[t]he summary judgment evidence does not show that Defendant Spicher actions [sic] were motivated by evil intent or involves [sic] callous or reckless indifference to federally protected rights." (Doc. 48 at 23). For the same reasons stated supra Part II.A, this claim fails.

The requisite culpability standard for punitive damages is similar to the "shocks the conscience" standard under the qualified immunity analysis and the "wanton or willful" standard under the statutory immunity analysis. See H.C. ex rel. Hewett v. Jarrard, 786 F.2d 1080, 1089 (11th Cir. 1986) ("Punitive

damages are appropriate [in § 1983 cases] where a defendant's conduct is motivated by evil intent or involves callous or reckless indifference to federally protected rights."). While there is no evidence that Spicher acted with evil intent, the evidence, viewed in the light most favorable to Waldron, shows that Spicher may have acted with callous or reckless indifference to Anthony's rights. Therefore, whether punitive damages are appropriate is a jury question.

### C. The Wrongful Death Claim

1. <u>Whether Spicher is entitled to sovereign immunity</u>.

Under Florida Statute § 768.28(9)(a), state officers, employees, and agents are immune from state lawsuits based on "any act, event, or omission of action in the scope of her or his employment or function." Fla. Stat. § 768.28(9)(a). "The immunity may be pierced only if state agents either act outside the scope of their employment, or act 'in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.'" <u>Eiras v. Fla.</u>, 239 F. Supp. 3d 1331, 1343 (M.D. Fla. 2017) (quoting § 768.28(9)(a)).

> Most definitions of willful or wanton conduct require that it appear that the defendant had knowledge of existing conditions, was conscious from such knowledge that injury would likely or probably result from his conduct, and with reckless indifference to the consequences consciously and intentionally does some wrongful act or omits to discharge some duty which produces the injurious result.

<u>Lemay v. Kondrk</u>, 923 So. 2d 1188, 1191 (Fla. 5th DCA 2006) (determining that the proper standard to evaluate sovereign immunity at the summary judgment stage is to determine whether a reasonable trier of fact could possibly conclude that the conduct was willful and wanton).

However, § 768.28 waives sovereign immunity for state agencies and municipalities by making them vicariously liable for their employees' and agents' good faith actions taken in the course and scope of their employment. § 768.28(9)(a). The statute states:

> The exclusive remedy for injury or damage suffered as a result of an act, event, or omission of an officer, employee, or agent of the state or any of its subdivisions or constitutional officers shall be by action against the governmental entity, or the head of such entity in her or his official capacity, . . . unless such act or omission was committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

<u>Id.</u> Therefore, if Spicher was only negligent, then he is immune under § 768.28, but Woods, as the Sheriff of Marion County, would face liability.

A genuine dispute of material fact exists whether Spicher consciously and recklessly disregarded a known risk of serious injury—making statutory immunity unavailable at this stage of the litigation. <u>See</u> <u>Lemay</u>, 923 So. 2d at 1191. Multiple witnesses claim that Spicher walked up to Mr. Timson and Mrs. VanEs and, without checking Anthony for signs of life, ordered them to stop CPR. (Docs. 47-1 at 78, 140–41; 48-3 at 36–37). Although Spicher recalls a

different version of events, this factual dispute precludes summary judgment. Fed. R. Civ. P. 56(a).

2. <u>There is a genuine dispute of material fact concerning whether Spicher's actions proximately caused Anthony's death</u>.

Spicher and Woods argue that regardless of immunity, summary judgment should be entered in their favor because Waldron cannot prove that Anthony would have lived had Spicher not interrupted CPR. (Doc. 45 at 6–16). However, Defendants' argument fails because there is a genuine dispute about how long Anthony was hanging and whether continuous CPR could have changed the outcome.

To succeed on her wrongful death claim, Waldron must prove that Spicher's actions proximately caused Anthony's death. <u>See</u> § 768.19, Fla. Stat. (2017). Where reasonable persons may disagree on the issue of proximate causation, the question should be decided by the jury. <u>City of Pinellas Park v. Brown</u>, 604 So. 2d 1222, 1228 (Fla. 1992). Waldron's expert, Dr. Mazyar Rouhani, opined that "[Anthony] would have survived the hanging and may have been neurologically intact if he would have continued to receive continuous CPR by [the] bystander[s] and EMS." (Doc. 41-1 at 3). This statement creates a genuine dispute of material fact concerning whether Spicher's action of halting CPR proximately caused Anthony's death. That Defendants' expert, Dr. Kris

Sperry, believes differently, (Doc. 42-1 at 5), puts the issue in dispute—it does not resolve it in their favor.

Given the current state of the record, proximate causation is a jury question, and Spicher and Sheriff Woods are not entitled to summary judgment.

## III. <u>DAUBERT</u> MOTIONS

Each side seeks to exclude, or at least limit, the opinions of the other side's expert. (Docs. 41; 42). Federal Rule of Evidence 702 governs the admissibility of expert testimony. Recently, the Court conducted an in-depth analysis of <u>Daubert v. Merrell Dow Pharmaceutical Inc.</u>, 509 U.S. 579, 593 (1993) and the requirements of Rule 702 in <u>Silcox v. Hunter</u>, No. 3:16-CV-1509-J-32MCR, 2018 WL 3633251, at *9 (M.D. Fla. July 31, 2018). For brevity, the Court will adopt its <u>Daubert</u> and Rule 702 discussion from <u>Silcox</u> and will proceed directly to the analysis.

### A. Motion to Exclude Rouhani

Defendants seek to exclude Waldron's expert, Dr. Mazyar Rouhani, on the basis that his opinions are inadmissible because they are unreliable and will not assist the trier of fact. (Doc. 41 at 9–13). Rouhani is an emergency medicine physician and has chaired and directed emergency medicine departments at several healthcare institutions. (Doc. 43-1). He has also taught at several medical schools and has conducted medical research. (Doc. 43-1 at 2–3). His primary opinion is "that Anthony Ybarra would have survived the hanging and

may have been neurologically intact if he would have continued to receive continuous CPR by bystander and EMS." (Doc. 41-1 at 3). However, Defendants assert that this opinion has not been tested, was not subjected to peer review, is unsupportable because Rouhani's experience concerning hanging victims is lacking, and is only based on the temporal relationship of Spicher's command to Anthony's death, which without more is insufficient. (Doc. 41 at 9–12). Defendants do not dispute that Rouhani is qualified, thus, only the reliability and helpfulness criteria are at issue.

1. Rouhani's opinions are reliable.

Waldron must demonstrate that Rouhani's opinions are reliable. U.S. v. Frazier, 387 F.3d 1244, 1261 (11th Cir. 2004) (en banc). Defendants assert that Rouhani's opinions are inadmissible because they are based on flawed reasoning and speculation. (Doc. 41 at 5). First, they argue that Rouhani has made no assumption about how long Anthony was hanging, but that such information is critical to determine whether Anthony could have survived had he received continuous CPR. (Doc. 41 at 5–6). However, Rouhani stated that he did not need to make an assumption about how long Anthony had been hanging because his opinions were based on Anthony's condition as relayed by the bystanders, paramedics, and hospital personnel. (Doc. 41-2 at 58). Rouhani stated that Anthony's legs were moving when he was found, (Doc. 41-2 at 55–56); (see also Doc. 47-1 at 72–73 (stating that Anthony was still swaying when

30

his mother reached him)), and that he did not have lividity or pooling, (Doc. 41-2 at 118). These two factors, along with others, indicate to Rouhani that Anthony had not been hanging for a prolonged period. (Doc. 41-2 at 55–56). Rouhani, based on his experience, believes that regardless of how long Anthony was actually hanging, his condition when found indicates that he could have survived had he received continuous CPR and other hospital care. (Docs. 41-1; 42-1 at 55–56, 118).

Second, Defendants contend that Rouhani's opinions are speculative and flawed because "Rouhani cannot express any opinion within either a reasonable degree of probability or certainty as to what [Anthony's] condition would have been if CPR would have continued." (Doc. 41 at 7). Defendants are correct in that Rouhani cannot put a numerical probability on Anthony's survival had CPR been continuous. However, Rouhani states that if you have two victims who go into cardiac arrest: "If you get continuous CPR as opposed to interrupted CPR, the patient with continuous CPR would have a better neurologic outcome and perhaps survive and walk out of the hospital. If you have interrupted CPR, all the studies show that you have a worse outcome." (Doc. 41-2 at 67). Rouhani relies on several studies that provide statistics for resuscitation efforts and hospital care.[16] (Docs. 41-1 at 3; 41-2 at 85–86); cf. Frazier, 387 F.3d at 1265

---

[16] Defendants take issue with Rouhani's statement that "Palm Beach County Fire Rescue reports 1 out of 3 ROSC patients leave the hospital

(stating that an expert's opinion on an "unclear, imprecise and ill-defined" probability was properly excluded because the expert could offer no reliable foundation or basis for his opinion). Therefore, Rouhani has "good grounds" for his opinion. See id. at 1261.

Next, Defendants contend that Rouhani's opinions are unreliable because they have not been tested and were not subject to peer review. (Doc. 41 at 9). However, testing or peer review of a scientific opinion is not required. See Frazier, 387 F.3d at 1262 (stating that the Daubert reliability factors are illustrative and not exhaustive); see also Daubert, 509 U.S. at 593 (stating that testing and peer review are "relevant, though not dispositive, consideration[s] in assessing" the reliability of scientific expert evidence). Here, Rouhani relied on eight studies and his professional experience to reach his opinions, (Doc. 41-2 at 82–89), and Defendants have not argued that these studies lack scientific validity. See Daubert, 509 U.S. at 593–95.

Lastly, Defendants attack the reliability of Rouhani's opinions on the basis that they are founded on unreliable methodology. (Doc. 41 at 10).

---

neurologically intact. This number is even greater in certain areas like Palm Beach Gardens which reports 56% year to date," (Doc. 41-1 at 3), because Rouhani learned this information via a phone call with the medical director of Palm Beach County Fire Rescue and not from any scientific study. However, Rouhani stated in his deposition that the publication of this study was forthcoming. (Doc. 41-2 at 84). If Rouhani intends to rely upon this study, it must be timely produced to Defendants.

Specifically, Defendants contend that: (1) Rouhani's limited experience with hanging victims is insufficient to form the basis of his opinion; and (2) Rouhani's opinion cannot establish causation solely because Spicher's command was given in close temporal proximity to Anthony's death. (Doc. 41 at 11–12).

Defendants state that "Rouhani's limited experience with hanging resuscitations, casual conversation with another medical professional cannot [sic] be a widespread accepted theory for offering such speculative opinions." (Doc. 41 at 11). Defendants fail to mention the eight cited studies in Rouhani's report, (Doc. 41-1 at 4–5), and the hundreds of other reports and specialized knowledge that Rouhani relied upon, (Docs. 41-2 at 21, 88, 113; 43-1 at 2–3). It is the combination of Rouhani's experience and these studies that form the basis of his opinions. The director of the emergency medicine department at a renowned hospital has a vested interest in understanding the importance of administering continuous CPR, even if he is unable to observe those patients' outcomes because they are elevated to higher levels of care.

Next, Defendants argue that the temporal proximity of Spicher's actions to Anthony's death is insufficient to establish that Spicher's actions caused Anthony's death. (Doc. 41 at 12 (citing Guinn v. AstraZeneca Pharm. LP, 602 F.3d 1245, 1254 (11th Cir. 2010)). However, this proposition from Guinn is inapplicable. To the contrary here, the temporal proximity of Spicher's actions to Anthony's death is vital to causation. The parties dispute whether Anthony

could have lived had Spicher not interrupted CPR, and the timing of Spicher's actions is a disputed material fact. Thus, Rouhani can appropriately formulate his opinions from the timeline of events in concert with his experience and scientific research. Therefore, Rouhani's opinions are reliable.

2. <u>Rouhani's opinions will assist the trier of fact</u>.

To assist the trier of fact, expert testimony must concern matters beyond the understanding of the average juror. <u>Frazier</u>, 387 F.3d at 1262. Defendants contend that Rouhani's opinions should be excluded as unhelpful to the jury because he improperly opines on the credibility of other witnesses. (Doc. 41 at 13). However, such contentions are not reasons to exclude his testimony.

Rouhani's opinions concerning the harms of interrupting CPR are not within the knowledge of an average juror and are therefore helpful. <u>See</u> <u>Frazier</u>, 387 F.3d at 1262. Rouhani states in his deposition that he disbelieved some of Spicher's statements because they were contradicted by other evidence in the case. (Doc. 41-2 at 60–62). Rouhani can make reasonable assumptions in formulating his opinions, <u>Maiz v. Virani</u>, 253 F.3d 641, 666–67 (11th Cir. 2001), and those assumptions can be attacked through cross-examination and the presentation of contrary evidence, <u>Rosenfeld v. Oceania Cruises, Inc.</u>, 654 F.3d 1190, 1194 (11th Cir. 2011). Rouhani's opinions will be helpful to the jury and are admissible.

**B. Motion to Exclude Sperry**

Waldron seeks to exclude Defendant's expert, Dr. Kris Sperry, claiming that he: (1) is unqualified to render opinions on the circumstances leading to Anthony's death and the medical treatment subsequently given; (2) has failed to show how his experience supports his conclusions; and (3) will confuse the jury. (Doc. 42).

        1. <u>Sperry is qualified to testify</u>.

Sperry is a medical doctor certified in anatomic and clinical pathology, (Doc. 45-1 at 35–36), and worked as a medical examiner for more than thirty years, (Doc. 44-1 at 2). Throughout his career, Sperry saw more than one thousand hanging deaths and possibly two thousand. (Doc. 45-1 at 41). He has been a professor in the pathology department at the University of New Mexico School of Medicine, Emory University School of Medicine, and the Medical College of Georgia. (Doc. 44-1 at 2–3). Sperry has reviewed approximately thirty to fifty cases involving the hanging of an individual under the age of eighteen. (Doc. 45-1 at 47–48). He has published articles and given lectures on asphyxiation. (Doc. 44-1 at 7–23). Sperry's experience makes him qualified to render an opinion on when and how Anthony died, something he did in the regular course of his employment of more than thirty years.

2. <u>Sperry's opinions are reliable</u>.

Waldron asserts that Sperry's opinions are unreliable because he does not show how his experience supports his conclusions and that he fails to cite any studies. (Doc. 42 at 5–8). Defendants contend that Sperry explains how his experience led to his opinions. (Doc. 44 at 11–14).

Sperry's opinion that Anthony had sustained irreversible brain death before Spicher arrived is admissible. <u>See</u> <u>Frazier</u>, 387 F.3d at 1262. Sperry said that he reviewed medical records, autopsy reports, and tissue slides to determine the cause and manner of death, an approach he used more than one thousand times during his career. (Doc. 45-1 at 49). His ample experience in determining the manner and cause of death in hangings using the same procedures here makes his opinions reliable. (Doc. 45-1 at 41, 47–48). Waldron also attacks Sperry's statement that "[f]or many years the survival in these cases was dismal, being consistently less than 5%." (Doc. 42-1 at 6). Waldron asserts that Sperry could not name any study that supports that statistic. (Doc. 42 at 8–9). Defendants contend that Sperry relies upon many medical studies he has read, and that Waldron failed to ask for the articles during Sperry's deposition or through discovery. (Doc. 44 at 12).

Sperry will need to further explain the basis for his statistical opinions if they are to be admissible. <u>See</u> <u>Frazier</u>, 387 F.3d at 1265. Despite Defendants' contention that Waldron had an opportunity to ask Sperry about the studies

and failed, the burden of proving an expert's reliability is on the party offering his opinions—in this case Defendants. See Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty., Fla., 402 F.3d 1092, 1107 (11th Cir. 2005). If Defendants seek to introduce this opinion during trial, the Court will allow voir dire outside the presence of the jury to examine the reliability of the "less than 5%" opinion.

3. Sperry's opinions will help the trier of fact.

Waldron argues that Sperry's opinions are unhelpful to the trier of fact. (Doc. 42 at 10–11). But, the likelihood of someone surviving a hanging is not information known by the average juror, and as such, Sperry's opinions will be helpful to the jury. See Frazier, 387 F.3d at 1262. Therefore, they are helpful to the jury and admissible.[17]

## IV. CONCLUSION

Accordingly, it is hereby

**ORDERED:**

1. Defendant Woods's Motion for Summary Judgment, (Doc. 45), is **DENIED**.

2. Defendant Spicher's Motion for Summary Judgment, (Doc. 48), is **DENIED**.

---

[17] Neither party asserted Rule 403, Federal Rules of Evidence, as a ground to exclude the other side's expert testimony. See Frazier, 387 F.3d at 1263.

3. Defendants' Motion to Exclude Opinions of Plaintiff's Expert, (Doc. 41), is **DENIED**.

4. Plaintiff's Motion to Strike or Limit Opinion Testimony Regarding Defendants' Expert, (Doc. 42), is **DENIED**.

5. Not later than **October 26, 2018**, the parties shall file a joint notice stating the trial term they are requesting. The Court will do its best to accommodate the parties' request. In the notice, the parties should also inform the Court whether a settlement conference with the magistrate judge would be beneficial.

   **DONE AND ORDERED** in Jacksonville, Florida this 5th day of October, 2018.

TIMOTHY J. CORRIGAN
United States District Judge

jb
Copies to:

Counsel of record